IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

)
MASSACHUSETTS FISCAL ALLIANCE,       )
           *Plaintiff,*            )
)
       v.                           )         No: 18-cv-_____
)
MICHAEL J. SULLIVAN,                 )
Director of Campaign and Political   )
Finance, *et al.*                    )
           *Defendants.*          )
_____)

---

## VERIFIED COMPLAINT

---

### Introduction

1. "[T]he First Amendment 'has its fullest and most urgent application'" in the context of "[f]ree discussion about candidates for public office." *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).

2. Nevertheless, the Commonwealth of Massachusetts compels speakers that mention representatives or candidates for office to accompany their "nonpartisan public discussion of issues of public importance," *Buckley v. Valeo*, 519 F.2d 821, 870 (D.C. Cir. 1975) (*en banc*), with a number of State-mandated pronouncements, some publicizing otherwise private information.

3. Plaintiff contends that this compulsory regime, principally codified at Massachusetts General Laws chapter 55, § 18G and its attending regulations,

1

violates the First Amendment's instruction, incorporated against the States by operation of the Fourteenth Amendment, that governments "shall make no law…abridging the freedom of speech." U.S. Const. amend. I.

4. Additionally, these requirements unconstitutionally infringe upon the First Amendment liberty of all Americans "to pursue their lawful private interests privately and to associate freely with others in so doing." *NAACP v. Ala.*, 357 U.S. 449, 466 (1958).

### Jurisdiction and Venue

5. This Court has jurisdiction because this action arises under the First and Fourteenth Amendments to the United States Constitution. 28 U.S.C. § 1331.

6. This Court also has jurisdiction pursuant to Section 1 of the federal Civil Rights Act of 1871. *See* 42 U.S.C. §§ 1983, 1988; 28 U.S.C. § 1343(a).

7. This Court has authority to grant the relief prayed for by Plaintiff pursuant to the federal Declaratory Judgment Act. 28 U.S.C. §§ 2201, 2202.

8. This Court is the proper venue for this case pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) ("a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located…[a] judicial district in which a substantial part of the events or omissions giving rise to the claim occurred").

9. Director Michael J. Sullivan and the Office of Campaign and Political Finance are based in—and any action the Office or Director Sullivan may take against Plaintiff would occur in—Boston, Massachusetts.

10. Attorney General Maura Healey and her office are also based in—and any action the Attorney General may take against Plaintiff would occur in—Boston, Massachusetts.

11. District Attorney John P. Pappas and his office are also based in—and any act the District Attorney may take against Plaintiff would occur in—Boston, Massachusetts.

## Parties

12. The Massachusetts Fiscal Alliance ("Alliance" or "MassFiscal") is a nonpartisan, nonprofit organization organized under 26 U.S.C. § 501(c)(4). It advocates for fiscal responsibility on the part of the Massachusetts state government, for transparency and accountability, and for increased economic opportunity for all people of the Commonwealth.

13. The Office of Campaign and Political Finance is the state entity in Massachusetts tasked with the civil enforcement of the Commonwealth's campaign finance laws. It is led by a director who "shall have the power and authority to investigate the legality, validity, completeness and accuracy of all reports and actions required to be filed and taken by candidates, treasurers, political committees, and any other person pursuant to [chapter 55 of the Massachusetts General Laws] and any other laws of the [C]ommonwealth pertaining to campaign contributions and expenditures." Mass. Gen. Laws ch. 55, § 3.

3

14. The current Director of Campaign and Political Finance is Michael J. Sullivan. He is sued solely in his professional and official capacity as director.

15. The Attorney General of the Commonwealth of Massachusetts is tasked with the capacity to bring "[a]ll civil actions to recover money for the [C]ommonwealth." Mass. Gen. Laws ch. 12, § 5. She is also tasked with the power to "refer [a] case to the proper district attorney for such action as may be appropriate in the criminal courts." Mass. Gen. Laws ch. 55, § 3.

16. The current Attorney General is Maura Healey. She is sued solely in her professional and official capacity as the Commonwealth's attorney general.

17. The current district attorney of Suffolk County is John P. Pappas. He is sued solely in his professional and official capacity as that county's district attorney.

## Facts

18. This case arises from provisions of Massachusetts General Laws chapter 55, principally section 18G, and its attending regulations at title 970 of the Code of Massachusetts Regulations.

19. That statute imposes a number of requirements, discussed *infra*, upon speech that takes place within 90 days of a general election.

20. The next general election in Massachusetts is scheduled for November 6, 2018.

### *The Massachusetts Fiscal Alliance*

21. The Massachusetts Fiscal Alliance is a nonpartisan nonprofit corporation organized under 26 U.S.C. § 501(c)(4).

22. The Alliance's chairman is Mark Cohen.

4

23. Part of the Alliance's mission involves educating the people of the Commonwealth about the activities of their state government. As part of that mission, it communicates with the Commonwealth's residents.

24. The Alliance is not under the control or influence of any political candidate or political party.

25. Federal law protects the privacy of donors to § 501(c)(4) organizations such as the Alliance. *See e.g.* 26 U.S.C. § 6104(d)(3)(A) (protecting "the disclosure of the name or address of any contributor to the organization").

26. The Alliance respects the privacy rights of its donors. Accordingly, and in the interest of full compliance, it has complied for years with an informal pre-clearance arrangement whereby it sends all advertisements and communications to lawyers from the Office of Campaign and Political Finance for review.

27. The lawyers then inform the Alliance whether the proposed communication would trigger a donor disclosure requirement or any other violation. A representative sample of these communications are attached as Exhibit A.

*The Alliance's Proposed Communications*

28. The Alliance wishes to make communications that will air before the November 6, 2018 general election, to inform citizens of the Commonwealth about policies being enacted by the state government at a time when the people's attention is focused on that legislative body.

29. The Alliance also wishes to make substantially and materially similar communications, across the same range of media, within 90 days of future Massachusetts general elections.

30. The Alliance wishes to air a short television advertisement in the Plymouth and Bristol, Massachusetts area on Fox News in the 30 days before the November general election. These communications will occur within the district of State Senator Marc Pacheco. The Alliance wishes to have the ad run on that network four times before the election, which will cost approximately $10,000.

31. The script of the Alliance's proposed television communication is:

*Two women, Abigail and Beth, are walking together down a suburban street.*

ABIGAIL: What's up with this Prop. 80?

BETH: Prop. 80? That's the *80 percent* tax increase the legislature voted on. Luckily the state Supreme Court recently ruled it unconstitutional.

*Abigail stops.*

ABIGAIL: What? They voted themselves a 40 percent pay raise already. They followed that up with an 80 percent tax increase?

BETH: That's right. Forty percent pay raise, and then the Supreme Court struck down their 80 percent tax scheme as unconstitutional.

*The women continue walking, Abigail shaking her head. She talks as we fade out to a Massachusetts Fiscal Alliance logo and the website address for the Alliance's legislative scorecard.*

ABIGAIL: What can we do about it?

*After fading completely to the logo and information.*

NARRATOR: Visit MassFiscalScorecard.org and see if State Senator Marc Pacheco voted for it. Contact Senator Pacheco's office and demand no more taxes, and no more pay raises.

32. The Alliance will also pay to place that video advertisement as paid internet advertising on the *Taunton Daily Gazette* during the 30 days before the November election. On these websites, the advertisement as displayed will "use[] 15% or more of a standard display resolution (1366x768) screen for [some] duration." 970 Code of Mass. Regs. 2.20(2)(c).

33. The Alliance also wishes to run paid for digital advertisements on Facebook, which will display the same video.

34. In addition, the Alliance intends to run the following radio advertisement over Station WRKO, which covers Senator Pacheco's district, in the 30 days before the November general election:

HOWIE: I'm with my friend Beth from the Massachusetts Fiscal Alliance. What's up with this Prop 80?

BETH: Proposition 80 is the 80 percent tax increase the legislature voted on. Luckily, the state Supreme Court recently ruled it unconstitutional.

HOWIE: They voted themselves a 40 percent pay raise, then an unconstitutional 80 percent tax increase?

BETH: That's right, they voted for a 40 percent pay raise, and the state Supreme Court struck down their 80 percent tax scheme.

HOWIE: What can we do about it?

BETH: Visit MassFiscalScorecard.org and if see if State Senator Marc Pacheco voted for it. Contact Senator Pacheco's office and demand no more taxes and no more pay raises.

35. The Alliance plans to run this ad 20 times, at a rate of twice a day for ten days before the election, at a total cost of approximately $4,200.

36. Additionally, the Alliance intends to send out direct mail to over 100 households in the Commonwealth in the 30 days before the general election.

37. The direct mail piece, attached as Exhibit B, is a legislative scorecard providing information to citizens of the Commonwealth regarding policies being pursued by their legislators.

38. If the Alliance were to run these advertisements, they would all constitute electioneering communications under Massachusetts law.

39. If allowed to do so without complying with the Commonwealth's compelled speech regime, discussed below, the Alliance intends to run advertisements that are substantively and materially similar to the television, radio, internet, and direct mail electioneering communications within 90 days of future general elections in Massachusetts.

40. Absent relief from this Court, the Alliance will engage in none of these communications.

## *The Commonwealth's Electioneering Communication Regulatory Regime.*

### What is an electioneering communication?

41. Massachusetts defines an electioneering communication as "internet communications which are…paid advertisements" or "any broadcast, cable, mail, satellite[,] or print communication that…refers to a clearly identified candidate; and…is publicly distributed within 90 days before an election in

8

which the candidate is seeking election or reelection." Mass. Gen. Laws ch. 55, § 1.

42. Massachusetts defines a "[c]learly identified candidate" as "a candidate whose name, photo[,] or image appears in a communication or a candidate whose identity is apparent by unambiguous reference in a communication." Mass. Gen. Laws ch. 55, § 1.

43. Additionally, Massachusetts excludes a number of categories of communications from being categorized as electioneering communications, such as: (1) speech targeted to fewer "than 100 recipients," (2) independent expenditures, (3) communications "from a membership organization exclusively to its members and their families," (4) any "email communications," and (5) "bonafide [*sic*] candidate debates or forums and advertising or promotion of the same." Mass. Gen. Laws ch. 55, § 1.

44. Massachusetts considers a "bonafide [*sic*]" debate or forum to include "a voter guide or questionnaire where all candidates running for the same office are asked the same question or questions and where all such candidates are given an equal opportunity to respond to each question, provided that said questionnaire or guide does not contain additional language, images, or symbols, conveying support or opposition to the opinions of the candidates." 970 Code of Mass. Regs. 1.14(1). The Alliance's legislative scorecard would not fall into this exception.

B4891884.1

Electioneering communication reporting.

45. Persons making "an electioneering communication expenditure in an aggregate amount exceeding $250 during a calendar year" must comply with a contribution reporting system. Mass. Gen. Laws ch. 55, § 18F.

46. The Alliance's proposed communications, both individually and in the aggregate, will cost over $250.

47. "[Seven] days after making the expenditure," the Office of Campaign and Political Finance must receive "a report" from the person "stating the name and address of the individual, group, association, corporation, labor union[,] or other entity making the electioneering communication, the name of any candidate clearly identified in the communication, the total amount or value of the communication, the name and address of the vendor to whom the payments were made[,] and the purpose and date of the expenditure." *Id.*

48. "In addition," to this report, if the person "receives funds to make electioneering communications," it must include "filing the date the funds were received, the name and address of the provider of funds in excess of $250, if any, and the value of the funds received." *Id.*

49. The accounting method by which these funds are reported is available at 970 Code of Massachusetts Regulations 1.22. *See e.g.* 970 Code of Mass. Regs. 1.22(9)(a) (in certain circumstances reporting is done on a "'last in, first out' accounting…until a sufficient number of donors have been identified and

10

reported to account for the full balance of the…electioneering communication").

50. The Alliance does not accept earmarked funds to produce electioneering communications and will not do so.

51. The Alliance does not solicit funds specifically to produce electioneering communications and will not do so.

52. The Alliance does not challenge the constitutionality of the expenditure reporting and related donor reporting regime for electioneering communications.

<u>Massachusetts's compelled speech regime.</u>

53. Unlike most other States and the federal government, the Commonwealth also compels speech, above and beyond a "paid for by" tag, on the face of electioneering communications. *Cf. Am. Civil Liberties Union of Nev. v. Heller*, 378 F.3d 979, 981 (9th Cir. 2004) (facially invalidating a Nevada statute "requir[ing] certain groups or entities publishing 'any material or information relating to an election, candidate or any question on a ballot' to reveal *on the publication* the names and addresses of the publications' financial sponsors…because it violates the Free Speech Clause of the First Amendment") (emphasis in original).

54. The Commonwealth's compelled speech falls into two categories: a "statement of responsibility" provision and an on-communication list of general donors.

a. *Compelled "Statement of Responsibility"*

11

55. For an electioneering communication made via paid radio advertising, the Commonwealth compels the speaker to "include a statement by the individual paying for the advertisement in which the person acknowledges paying for the message and identifies that person's city or town of residence." Mass. Gen. Laws, ch. 55, § 18G.

56. "If the radio…advertisement is paid for by a corporation, group, association[,] or a labor union, the following statement shall be made by the chief executive officer of the corporation, the chairman or principal officer of the group or association or the chief executive or business manager of a labor union. I am _____ (name), the _____ (office held) of _____ (name of corporation, group, association or labor union) and _____ (name of corporation, group, association or labor union) approves and paid for this message." *Id.*

57. It will take approximately eight seconds for Plaintiff's chief executive officer to make that statement.

58. Television advertisements must also include the "statement of responsibility" provision.

59. "The statements in television advertisements shall be conveyed by an unobscured, full-screen view of the person making the statement." *Id.*

60. "If…[the] electioneering communication is transmitted through internet advertising, the statement shall appear in a clearly readable manner with a

12

reasonable degree of color contrast between the background and the printed statement." *Id.*

61. Defendants have not provided binding guidance as to what is "a clearly readable manner with a reasonable degree of color contrast." *Id.*; 970 Code of Mass. Regs. 2.20(6)(a) ("The required disclaimers must be of a size and contrasting color that will be legible to the average viewer.").

62. The Office of Campaign and Political Finance has issued guidance with respect to the statement of approval for internet ads that "the color contrast requirement is met if the disclaimer is printed in black on a white background, or if the degree of contrast between the background color and the disclaimer text is at least as great as the degree of contrast between the background color and the color of the largest text in the communication." OCPF-IB-10-01 (Sep. 2010) (rev. June 22, 2018). This guidance does not apply to television advertisements, however, and it does not provide any guidance for the top contributor proclaimer. Furthermore, the OCPF's guidances are not binding. *See 1A Auto, Inc. v. Dir. of the Office of Campaign & Political Fin.*, 480 Mass. 423, 442 n.10 (2018) (noting that an OCPF interpretive bulletin was "not a promulgated regulation that carries the force of law"); *Golchin v. Liberty Mut. Ins. Co.*, 460 Mass. 222, 231, 950 N.E.2d 853, 861 (2011) (noting that agencies like the OCPF do "not consider bulletins to be binding regulations"). Thus, the bulletin is not a safe harbor, and neither the Director nor electors are required to heed even the guidance it does give in filing complaints. *See* Mass. Gen.

13

Laws ch. 55, § 3 (noting that "five registered voters" may file a written complaint).

63. Per regulation, "social media advertising" is exempted from this requirement, although "[a] video advertisement of any duration is subject to the disclaimer requirement if the advertisement uses 15% or more of a standard display resolution (1366x768) screen for any duration, including 'pop up ads' that use 15% or more of the computer screen." 970 Code of Mass. Regs. 2.20(2)(c-d).

64. Printed electioneering communications do not need a "statement of responsibility."

b. Generalized Contributors Disclosure.

65. In addition, "[a]n…electioneering communication made by an individual, corporation, group, association, labor union[,] or other entity which is transmitted through paid television, internet advertising[,] or print advertising appearing larger than 15 square inches or direct mail or billboard" must also carry a specific, government-mandated message. Mass. Gen. Laws ch. 55, § 18G.

66. They must "include a written statement at the bottom of the advertisement or mailing that contains the words 'Top Contributors' and a written statement that lists the 5 persons or entities or if fewer than 5 persons or entities, all persons and entities that made the largest contributions to that entity, *regardless of the purpose for which the funds were given.*" *Id.* (emphasis added).

67. Specifically, "[a] Top Contributor Disclaimer must be included…if the advertisement or communication is paid for by any individual or entity (including a political committee) that has raised more than $5,000 in the aggregate from any contributor during the 12-month period before the date of the…communication." 970 Code of Mass. Regs. 2.20(3).

68. "If no such contribution is received by the entity making an…electioneering communication, the advertisement or communication may exclude the statement." Mass. Gen. Laws ch. 55, § 18G.

69. The Office of Campaign and Political Finance has emphasized that "[c]ontributions received by the entity for purposes other than the making of the advertisement or communication are included. The terms 'contributors' and 'contribution'…refer to donors who provide funds to an entity for any purpose." 970 Code of Mass. Regs. 2.20(5)(a).

70. "If more than five persons or entities contribute the same amount, only the last five to give that amount must be listed. (For example, if seven persons give $10,000 each, with two giving in February but the other five giving in July, only the five who gave in July need to be listed.)" 970 Code of Mass. Regs. 2.20(5)(c).

71. "Contributions from multiple affiliated organizations are not aggregated. For example, if a union local gives $2,000 and another local, affiliated with the same international union, gives $3,500, the union is not required to be listed,

since the local, not the international union, is the contributor." 970 Code of Mass. Regs. 2.20(5)(e).

72. "The contributors may be listed in any order, and do not have to be listed in ascending or descending order based upon the amount contributed." 970 Code of Mass. Regs. 2.20(5)(d).

73. "The advertisement or communication shall also include a written statement, as specified by the director, at the bottom of the advertisement or communication that directs viewers to the official web address of the office of campaign and political finance." Mass. Gen. Laws, ch. 55, § 18G. Specifically, it must state "'for more information regarding contributors, go to www.ocpf.us.' This requirement applies even if no 'top contributors' must be listed." 970 Code of Mass. Regs. 2.20(7).

74. Any violation of the disclaimer regime "shall be punished by imprisonment in the house of correction for not more than 1 year or by a fine of not more than $10,000, or both." Mass. Gen. Laws, ch. 55, § 18G.

75. The Alliance does not wish to carry the Commonwealth's messages on its communications, nor will it violate the privacy of its general donors, as a cost of speaking about the state government. Additionally, this state-mandated expression will require the Alliance to include space and time to accommodate the Government's compelled speech. These additions are not costless. For example, the addition of eight seconds of radio time costs $56 per advertisement, and the addition of eight seconds of television time costs $667.

76. Accordingly, if it were to distribute any of its advertisements without providing the state mandated speech, the Alliance reasonably fears Defendants will bring civil or criminal enforcement proceedings against it and its officers.

## *Constitutional Issues with Massachusetts's Compelled Speech Regime*

77. Thus, in the case of the Alliance's proposed advertisements, Commonwealth law will require:

   a. The Alliance to direct viewers to a Government website, namely that of Defendant, the Office of Campaign and Political Finance.

   b. Force the Alliance to publicly identify the private affiliation of five of its donors, and list them on the face of the communication as though they authored it, even if they only privately gave to fund MassFiscal's general mission.

   c. Provide extra space on the face of a communication to carry the Government's message.

   d. Add as much as eight seconds to radio and television communications with this Government message, diluting the Alliance's speech.

   e. Force the Alliance to show the physical appearance, sex, gender, race, speech pattern, obvious disability or lack thereof, and other irrelevant personal characteristics of its chairman as a condition of speaking.

78. The only way that the Alliance, or any other group that wishes to make similar communications close in time to an election, can avoid these burdens is to remain silent. *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 796-797 (1988) ("[T]he

17

First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say") (emphasis in original).

79. "Statutes like the one here at issue…must be, and have been, viewed as serious, content-based, direct proscription of political speech: If certain content appears on the communication, it may be circulated; if the content is absent, the communication is illegal." *Heller*, 378 F.3d at 992.

80. "The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it…free and robust debate cannot thrive if directed by the government." *Riley*, 487 U.S. at 790-791 (citations omitted).

81. What information to place on the face of a television, internet, radio, or print communication, "like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995).

82. Even if "compelled statements of 'fact'" are at issue, and "the…factual information might be relevant to the listener…a law compelling its disclosure would clearly and substantially burden the protected speech." *Riley*, 487 U.S. at 797-798; *id.* at 798 ("[W]e would not immunize a law requiring a speaker favoring a particular government project to state at the outside of every address the average cost overruns in similar projects, or a law requiring a

18

speaker favoring an incumbent candidate to state during every solicitation that candidate's recent travel budget.").

83. Consequently, compulsory speech on the face of a communication is heavily disfavored under the First and Fourteenth Amendments. *Talley v. Cal.*, 362 U.S. 60 (1960) (striking down a "statement of responsibility" requirement on handbills in the absence of an adequate governmental interest).

84. Moreover, the First and Fourteenth Amendments protect "the right of" all Americans "to pursue their lawful private interests privately and to associate freely with others in so doing." *NAACP*, 357 U.S. at 466. Reporting the names of general donors violates that First Amendment associational liberty. *McIntyre*, 515 U.S. at 357 ("Anonymity is a shield from the tyranny of the majority.").

85. Indeed, only the most minimal intrusions on the substance of political speech have been found constitutionally permissible by the U.S. Supreme Court, and only in the context of large, broadcast communications.

86. In 2010, the U.S. Supreme Court upheld, against a First Amendment challenge, a federal law that required an authorship statement ("____ is responsible for the content of this advertising"), a qualification that the large broadcast advertisement was independent of a candidate ("is not authorized by any candidate or candidate's committee"), and a "display [of] the name and address (or Web site address) of the person or group that funded the

B4891884.1

advertisement." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366 (2010).

87. Unlike Massachusetts's law, this authorship statement did not need to be made on camera (or via audio) by a group's principal officer. Nor did federal law force the disclosure of irrelevant contributors on the face of the communication.

88. The *Citizens United* Court upheld this modest authorship requirement only after subjecting it to "exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 366-367 (citations and internal quotation marks omitted); *but see Heller*, 378 F.3d at 992-993 (applying strict scrutiny to broad, contributor-focused, on-communication compelled speech regime).

89. The Supreme Court has *not* upheld on-communication disclosure of donors who did not give for the express purpose of funding the relevant communication, and at least one Court of Appeals has found such a regime unconstitutional. *Heller*, 378 F.3d at 994 ("[F]ar from enhancing the…evaluation of a message, identif[ication]…can interfere with that evaluation by requiring the introduction of potentially extraneous information at the very time the [viewer or reader] encounters the substance of the message."); *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218 (2014) ("In the First Amendment context, fit matters.").

90. Just two years ago, the D.C. Circuit rebuffed an Administrative Procedure Act challenge to the federal regulation that limited after-the-fact disclosure, via off-communication reporting, of donors that earmarked their contributions expressly to make an electioneering communication. There, the plaintiff argued that this regulation was too narrow, and that all other donors should have to be reported. The Court of Appeals rejected this argument. In doing so, the Court specifically noted the constitutional dangers of labeling donors that give generally, as opposed to directly for the purpose of a particular ad, as the putative authors of an advertisement. *Van Hollen v. Fed. Election Comm'n*, 811 F.3d 486, 497 (D.C. Cir. 2016) ("[A] robust disclosure rule would thus mislead voters as to who really supports the communications.").

91. By listing unrelated donors as the putative authors of a specific communication, then, Mass. Gen. Laws ch. 55, § 18G undermines the First Amendment "right to eschew association for expressive purposes." *Janus v. Am. Fed'n of State, Cty. and Mun. Emps., Council 31*, 585 U.S. __; 138 S. Ct. 2448, 2463 (2018).

92. Nor has the Supreme Court reviewed those portions of federal law that provide for a "visual disclosure" of candidates for office. *See* 52 U.S.C. § 30120 (d)(1)(B)(i)(I) (requiring "unobscured, full-screen view of the candidate making the statement"); *but see McIntyre*, 514 U.S. at 348-349 (striking disclosure that "add[s] little, if anything, o the [audience's] ability to evaluate the" message).

B4891884.1

93. Nor has the Court upheld the compulsive broadcasting of government messages that drown out the substance of an independent communication. *See Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 832 (7th Cir. 2014) ("The extra verbiage required by the rule goes well beyond the short disclaimer required…[and] consume[s] a significant amount of paid advertising time in a broadcast ad.").

94. Nor has the Court compelled political speakers to direct a viewer, listener, or reader's attention to a political enforcement arm of the Government, rather than to the website or address of the speaker itself. *Citizens United*, 558 U.S. at 366-367; *Nat'l Inst. of Family and Life Advocates v. Becerra*, 585 U.S. __; 138 S. Ct. 2361, 2371 (2018) (striking down state law compelling private entity to give notice about "the availability of state-sponsored" information and services); *see also McCutcheon*, 572 U.S. at 206 ("The First Amendment does not protect the government, even when the government purports to act through legislation reflecting 'collective speech.'").

95. Ultimately, all of the elements of Massachusetts's on-communication compelled speech, both individually and singly, cause the Commonwealth to "co-opt [the Alliance] to deliver its message for it. '[T]he First Amendment does not permit the State to sacrifice speech for efficiency.'" *Nat'l Inst. of Family and Life Advocates*, 138 S. Ct. at 2376 (quoting *Riley*, 487 U.S. at 795).

96. This is even more constitutionally problematic given that Massachusetts already has a robust regime for the publication of donors that give for the

22

purposes of financing electioneering communications. That system, compared with the Commonwealth's compelled speech regime, hews closer to the governmental interest in disclosure that the Supreme Court has determined is compelling enough to override the presumption of First Amendment privacy. *See Buckley v. Valeo*, 424 U.S. at 66-67, 79-81 (upholding off-communication disclosure that will "increase[] the fund of information concerning" the financial constituencies "who support the candidates").

97. As the Ninth Circuit has noted, "[c]ampaign regulation requiring off-communication reporting of expenditures made to finance communications" are "considerably more effective[]" at distributing information to the electorate and "does not involve the direct alteration of the content of a communication." *Heller*, 378 F.3d at 994; *see also id.* at 999 ("The assistance provided by [on-communication disclosure] toward enforcing the campaign finance laws is therefore minimal.").

98. The on-communication compelled speech regime of Mass. Gen. Laws, ch. 55, § 18G is not a less restrictive means of advancing an important governmental interest. It is facially unconstitutional under either the First Amendment's strict scrutiny test typically reserved for compelled speech questions, or the exacting scrutiny test applied to the compulsion of mere authorship of large broadcast purchases close in time to an election. *See McCutcheon*, 572 U.S. at 218 ("Even when the Court is not applying strict scrutiny, we still require

23

'a…means narrowly tailored to achieve the desired objective.'" (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).

99. Alternatively, assuming *arguendo* the section 18G regime is not facially unconstitutional, it is unconstitutional as it applies to speech which does not promote, support, attack, or oppose a specific candidate. *See Citizens United*, 558 U.S. at 320 ("Each ad includes a short (and, in our view, pejorative) statement about Senator Clinton…."). The Alliance's ads are about legislative issues regarding the revenue generation and spending priorities of the Massachusetts General Court, not the evaluation of candidacies for office— indeed, while Senator Pacheco is up for re-election, he is running uncontested.

## Causes of Action

100. As to each of the following Causes of Action, Plaintiff incorporates herein by reference the allegations made in paragraphs 1-99, as well as each preceding paragraph after this one, as if each were set forth there verbatim.

**Count I: Declaratory judgment regarding "visual disclosure" of the Alliance's chief executive officer as a condition of engaging in issue speech via television.**

101. In order to run a televised electioneering communication, the Commonwealth requires the "chief executive officer of the corporation" or "the chairman or principal officer of the group" to speak a compelled script. Mass. Gen. Laws, ch. 55, § 18G.

102. In the Alliance's case, that script would read "I am Mark Cohen, the chairman of the Massachusetts Fiscal Alliance and the Massachusetts Fiscal Alliance approves and paid for this message."

103.     Moreover, the Commonwealth requires that the chief executive officer
"be conveyed by an unobscured, full-screen view of the person making the
statement." *Id.*

104.     Thus, as a condition of conducting certain political speech about
legislative issues to citizens of the Commonwealth, Defendants require
speakers to provide the physical appearance, sex, gender, race, speech pattern,
obvious disability or lack thereof, and other irrelevant personal characteristics,
of a group's principal officer to the viewing audience.

105.     Moreover, as a condition of conducting certain political speech about
legislative issues, Defendants require approximately eight seconds of time for
a given communication to be directed to providing information the
Commonwealth demands.

106.     The Alliance seeks a declaration that, facially and as-applied to its
proposed television communications, this compulsory visual disclosure and
attendant compelled speech script is unconstitutional pursuant to the First
and Fourteenth Amendments of the Constitution of the United States.

**Count II: Declaratory judgment concerning the compulsory "statement of
responsibility" proclaimer as a condition of engaging in issue speech via radio.**

107.     The Commonwealth mandates that the "chief executive officer of the
corporation" or "the chairman or principal officer of the group" speak a
Government-written script for radio electioneering communications. Mass.
Gen. Laws ch. 55, § 18G.

108.     In the Alliance's case, that script would read "I am Mark Cohen, the chairman of the Massachusetts Fiscal Alliance and the Massachusetts Fiscal Alliance approves and paid for this message."

109.     Thus, as a condition of conducting certain political speech about legislative issues, Defendants compel specific speech from the Alliance's principal officer.

110.     Moreover, as a condition of conducting certain political speech about legislative issues, Defendants require approximately eight seconds of time for a given communication to be directed to providing information the Commonwealth demands.

111.     The Alliance seeks a declaration that, facially and as-applied to its proposed radio communications, this compulsory audio disclosure is unconstitutional pursuant to the First and Fourteenth Amendments of the Constitution of the United States.

**Count III: Declaratory judgment against the compulsory "statement of responsibility" proclaimer as a condition of engaging in issue speech via internet advertising.**

112.     In order to distribute an electioneering communication via internet advertising, where the "the advertisement, when received by a user viewing the message using a standard display resolution (1366x768) screen, would use 15% or more of the computer screen," Defendants compel speech. 970 Code of Mass. Regs. 2.20(2)(c); *see also id.* 2.20(2)(d) (applying requirement where

"advertisement uses 15% or more of a standard display resolution (1366x768) screen for any duration").

113.     As the Alliance will run internet electioneering communications that fit the requirements of 970 Code of Mass. Regs. 2.20(2)(c-d), those communications will have to provide the same statement that a principal officer must read in a radio or television advertisement, but it must be shown as a "printed statement" that "appear[s] in a clearly readable manner with a reasonable degree of color contrast." Mass. Gen. Laws, ch. 55, § 18G.

114.     Thus, although internet advertising does not contextually require the extraneous language describing the principal officer of a group for context ("I am Mark Cohen, the president of the Massachusetts Fiscal Alliance"), this speech is still mandated by Defendants—a confusing compulsion of speech that will only distract online viewers from a speaker's message.

115.     The Alliance seeks a declaration that, facially and as-applied to its proposed internet communications, this compulsory speech is unconstitutional pursuant to the First and Fourteenth Amendments of the Constitution of the United States.

## Count IV: Declaratory judgment against the compulsory "statement of responsibility," a condition of engaging in issue speech via internet advertising, as unconstitutionally vague.

116.     As the Alliance will run internet electioneering communications that fit the requirements of 970 Code of Mass. Regs. 2.20(2)(c-d), those communications will have to provide the same statement that a principal

officer must read in a radio or television advertisement, but it must be shown as a "printed statement" that "appear[s] in a clearly readable manner with a reasonable degree of color contrast." Mass. Gen. Laws, ch. 55, § 18G.

117.    This means that "[t]he required disclaimers must be of a size and contrasting color that will be legible to the average viewer." 970 Code of Mass. Regs. 2.20(6)(a).

118.    "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

119.    But phrases such as "reasonable degree of color contrast," Mass. Gen Laws, ch. 55, § 18G and "legible to the average viewer," 970 Code of Mass. Regs. 2.20(6)(a), especially when dealing with advertisements placed online, which may be viewed on a near-infinite plethora of devices, applications, and machines, do not provide the "fair warning" that is a "basic principle of due process." *Grayned*, 408 U.S. at 108.

120.    "[W]here a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'" *Id.* at 109 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) and *Cramp v. Bd. of Public Instruction*, 368 U.S. 278, 287 (1961) (brackets in original).

28

121.     The Alliance seeks a declaration that this compelled online speech is unconstitutionally vague pursuant to the First and Fourteenth Amendments of the Constitution of the United States.

**Count V: Declaratory judgment against the Commonwealth's mandatory deprivation, as a condition of making television, internet, or print issue communications, of the right to privacy of five persons that have contributed to the Alliance for other purposes.**

122.     In order to distribute its proposed communications via "paid television, internet advertising[,] or…direct mail," the Alliance will be forced to place, on the communication itself, "the words 'Top Contributors' and a written statement that lists the 5 persons or entities," Mass. Gen. Laws, ch. 55, § 18G, "making the largest contributions received for any purpose in excess of $5,000 during the 12-month period before the date of the advertisement." 970 Code of Mass. Regs. 2.20(5)(a).

123.     Thus, as a condition of conducting certain political speech about legislative issues, Defendants require not only compelled speech, but compelled speech that violates the First Amendment associational privacy rights of five of Plaintiff's donors.

124.     These donors are not the authors of the Alliance's proposed communications.

125.     Nor will these donors have directly funded the Alliance's proposed communications. The Alliance does not accept earmarked contributors for electioneering communications. The Alliance does not—and will not—solicit contributions for making electioneering communications.

126.     The Alliance seeks a declaration that, facially and as-applied to its communications, this compulsory deprivation of freedom of speech and association is unconstitutional pursuant to the First and Fourteenth Amendments of the Constitution of the United States.

**Count VI: Declaratory judgment as to the Commonwealth's requirement that speakers advertise the Office of Campaign and Political Finance's online presence.**

127.     Certain electioneering communications must "include a written statement…that directs viewers to the official web address of the office of campaign and political finance." Mass. Gen. Laws, ch. 55, § 18G.

128.     Specifically, "communications transmitted through paid television or internet advertising requiring a top contributor disclaimer must include a written statement…stating 'for more information regarding contributors, go to www.ocpf.us.' This requirement applies even if no 'top contributors' must be listed." 970 Code of Mass. Regs. 2.20(7).

129.     The Alliance seeks a declaration that, facially and as-applied to its communications, this compelled speech is unconstitutional pursuant to the First and Fourteenth Amendments of the Constitution of the United States.

### Prayer for Relief

**Wherefore**, Plaintiff prays that this Court:

A. Enter judgment, including declaratory judgment pursuant to 42 U.S.C. § 1983, in favor of Plaintiff and against Defendants.

30

B4891884.1

B.  Upon proper motion, issue preliminary and permanent injunctive relief enjoining Defendants from enforcing, or threatening to enforce, Mass. Gen. Laws ch. 55, § 18G and attendant obligations thereto against Plaintiff.

C.  Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

D.  Allow and order such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Thaddeus A. Heuer
Thaddeus A. Heuer (BBO #666730)
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA  02210-2600
Telephone:  (617) 832-1000
Fax:  (617) 832-7000
theuer@foleyhoag.com

/s/ Allen Dickerson
Allen Dickerson*
Zachary R. Morgan*
Institute for Free Speech
124 S. West St., Ste. 201
Alexandria, VA 22314
adickerson@ifs.org
zmorgan@ifs.org
P: (703) 894-6800
F: (703) 894-6811

*pro hac vice admission pending

Dated: October 10, 2018

B4891884.1

**VERIFICATION**

COMMONWEALTH OF          )
MASSACHUSETTS            )
                         ) ss.
COUNTY OF Suffolk        )

I, Carl Copeland, being first duly sworn, state under oath that I have read the foregoing

VERIFIED COMPLAINT, and that the statements contained therein are true and correct to the

best of my knowledge, information, and belief.

Subscribed and sworn before me this 9th day of October, 2018.


Notary Public

My Commission Expires: March 23, 2023

PAMELA B. COLE
Notary Public
Massachusetts
Commission Expires Mar 23, 2023